BEFORE THE SECOND DIVISION, MAY 20, 1954

**No. 58115.**—C. J. Tower & Sons v. United States, protest 144239–K (Buffalo).

LAWRENCE, Judge: Certain so-called Toridheet oil burners and parts were, upon importation, classified by the collector of customs in paragraph 353 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 353), as modified by the trade agreement between the United States and the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, as "Machines [and parts] having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device." Accordingly, duty was assessed thereon at the rate of 27½ per centum ad valorem.

Plaintiff contends that said merchandise should be held dutiable at 25 per centum ad valorem pursuant to said paragraph 353, as modified, *supra*, which provides for articles having as an essential feature an electrical element or device except, *inter alia*, those machines not specially provided for therein which would

be dutiable within the purview of paragraph 372 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 372), if of a kind which could be designed to operate without such electrical element or device.

The sole question submitted for our determination, therefore, is whether the subject merchandise consists of machines (and parts) which could be designed to operate without an essential electrical element or device.

The pertinent portions of the statutes which cover the classification of the imported merchandise are as follows:

Paragraph 353, as modified, *supra*, and the basis of the collector's classification:

Machines having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device (except articles of a class or kind with respect to which United States import duties have been reduced or bound against increase pursuant to any agreement heretofore concluded under section 350 of such act, as amended); all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule, 27½% ad val.

Parts, not specially provided for, finished or unfinished, wholly or in chief value of metal, of any articles provided for in any item numbered 353 in this schedule, shall be dutiable at the same rate of duty as the articles of which they are parts.

Paragraph 353, as modified, *supra*, which is contended by plaintiff to be the proper basis for classification of the subject merchandise:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, electrical generators, transformers, converters, double current and motor generators, dynamotors, and all other articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, locomotives, portable tools, furnaces, heaters, ovens, refrigerators, and signs (except telephone, wiring, diagnostic, and therapeutic apparatus, instruments, and devices, primary cells, flashlights, switches, switch gear, fans, blowers, washing machines, and machines not herein provided for by name which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device, and except articles of a class or kind with respect to which United States import duties have been reduced or bound against increase pursuant to any agreement heretofore concluded under section 350 of such act, as amended); all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule, 25% ad val.

The trial record consists of the testimony of a witness called by the plaintiff and one who appeared on behalf of defendant, together with two exhibits introduced by plaintiff.

Exhibit 1 is a photograph of the Model J Toridheet oil burner in controversy, and exhibit 2 is a blueprint of said burner.

Plaintiff's witness, William Henry, testified that he is the chief engineer of the Conroy Manufacturing Co., Ltd., of St. Catherines, Ontario, Canada, manufacturer and seller of oil burners and equipment, auto parts, and pole line hardware; that he has been with the company for 14 years, his duties consisting of designing the various products; and that he participated in the designs of the oil burner in controversy.

The witness further testified that there are three main types of domestic oil burners, namely, the pot type, which uses gravity or mechanical means of draft; the gun type pressure atomizing burner, which delivers the oil to the combustion chamber under pressure; and the rotary type, which sprays oil on the side walls of the furnace but not under pressure; and that exhibits 1 and 2 illustrate the gun

type pressure atomizing oil burner. The witness described the operation of the Toridheet oil burner with the aid of exhibit 2 as follows:

A. On the demand of the thermostat or room thermostat the oil burner stack or protector relay makes contact and allows power to the oil burning unit.

Q. Is that an electrical contact?—A. Yes.

Q. Go ahead.—A. The power is then allowed through the circuit to the oil burner motor as indicated on this drawing part No. S–5537. This motor is the means of motion to drive the pressure pump, part No. S–5541, and also rotates the air fan, part No. C–1134. The pump is a geared pump that draws the oil from the storage tank. It then builds up a pressure of approximately 100 pounds and then is delivered through an oil line to the nozzle. I just can't find the part number here of that oil line.

Q. Well, never mind that, you can go ahead without it.—A. The oil is then atomized through an atomizing nozzle at the tip of the fuel line in the combustion chamber and the air—the fan throws the air through the glass tube, part No. C–1108, and mixes this air with the oil to give proper combustion. At the same time as the power is admitted to the motor it also allows the power to the ignition transformer. The power then in the transformer is supplied at 110 volts and it is through this transformer changed to 10,000 volts and carried along the igniter assembly, C–1117, which has a gap just above the oil atomizing nozzle which the power jumps the gap and creates an ignition spark which ignites the oil in the combustion chamber. Now, the air must be adjusted to give proper combustion, that is, the air is just sufficient air to burn the amount of oil supplied to the combustion chamber.

That the oil burner in controversy has an essential electrical element or device, such as a motor, was indicated on exhibit 2 as part number S–5537 and by the ignition transformer as part number C–1009. It appears from the testimony of the witness Henry that without these two parts the burner would be useless and that this particular type of burner could not be designed without such electrical element or device because there must be a motive power to drive the fans to supply the air and to rotate the geared pump in order to obtain the necessary pressure. The witness also stated that no other source of power could be used because his firm is governed by the Underwriters Association of the United States, which requires electric motor power similar to that supplied with the Model J burner, and the association also requires a totally enclosed motor. Moreover, the witness did not know of any motor other than an electric motor which is designed to operate in an oil burner of the kind in controversy.

Referring further to the three main types of domestic oil burners, the witness testified that there is nothing electrical about the pot type burner as it is designed to use either the natural draft or a forced draft, and the rotary type burner uses gravity for the intake of oil but is ignited and controlled by an air gun in a similar manner to that employed in the gun type burner, the imported burner being of the last-named type. That while a gasoline motor might be designed to operate the rotary and gun type burners, the Underwriters Association would not allow one to use a gasoline motor in a home. Furthermore, the witness stated that for practical purposes the cost of the gasoline motor power would not permit one to compete in business against electric motor power. Even so, if a gasoline motor could be designed to operate with a gun type burner, it would still require ignition spark plugs and an ignition system as essential electrical features in order to function.

With regard to the pot type burner, the witness stated that it is usually turned on and off manually, whereas the gun type burner is entirely automatic, the automatic features being controlled by a series of electrical devices, such as a thermostat, a limit control, and a protector relay, which are turned on and off by electricity.

The witness Henry further testified in substance that the gun type burner could not be designed without essential electrical features. The transformer, for

example, which ignites the oil with a spark, is an electrical element without which one would need a constantly burning pilot light in the pot. So, too, with the rotary type burner, which operates with an ignition transformer, instead of a pilot light, turned on and off electrically by a thermostat which, by mechanical means, trips to make a contact allowing the power to go to the motor and transformer, operating automatically.

This completes the salient features of the testimony presented on behalf of plaintiff.

Defendant called as its witness, Charles R. Turner of the Charles R. Turner Co. of Buffalo, who has been engaged in the installation of all types of heating equipment since 1924. He testified that he had installed gas, oil, and coal furnaces or boilers and is acquainted with the Toridheet oil burner of the gun type of which his firm had installed about 5,000. He stated that they are operated by electrical means—"they have a fan, a motor and a fan on it with a transformer and a nozzle"—that the oil is atomized through a pump and comes out through a nozzle, the oil being ignited electrically by a couple of electrodes.

This witness also testified that the gun type burner can be designed to operate without any electrical element or device by replacing the electric motor with a gasoline pump and a gas ignition; that this has been done "on a number of occasions" in mountainous countries where electricity is not available; and that he remembered having installed such a gun type burner some years ago for a greenhouse.

Turner described the operation of a Toridheet gun type oil burner as follows:

There is an electric motor connected to a fan. And on a direct line; the fan is on the same shaft that comes off the electric motor. The fan is on that shaft. And it is also connected to an oil pump which raises the pressure of the oil up so it atomizes through the nozzle. The fan is used to bring air in to combust the oil. There are two electrodes at the end of the nozzle which picks up—which throws a spark across the nozzle for ignition purposes. And on the bottom of the oil burner is usually a transformer—or on the side—to create a high arc in the electrodes.

The witness further testified that the essential elements of the gun type oil burner are the electric motor, which operates the fan and the pump, and the transformer, which ignites the oil through electrodes. During his business experience, Turner had installed two or three oil burners in locations having no electric power, gasoline motors being used which have to be started manually while the gun type burner is started by an automatic thermostat; that the burner requires electrical devices such as the protector relay, a limit control, and the thermostat, which he admitted were parts of the regular equipment of the gun type oil burner; that the gun type burner which he installed in a greenhouse without the use of electricity was a burner designed for continuous operation there being no thermostat or electric power of any kind. To quote from his testimony—

The electric motor was taken off and the transformer was taken off. The electrodes were taken out. A substitute was made by a gasoline motor, which [sic] a pulley was connected where the electric motor is usually on the burner and then a gas pilot was put in there for ignition.

The above, he admitted, was a substantial change.

This concludes the testimonial record. It may be noted, in passing, that the record is devoid of any direct proof establishing how or where the instant burners are utilized.

The adversary parties herein both rely upon our decision in *K. Engelsted* v. *United States*, 18 Cust. Ct. 87, C. D. 1049, in support of their respective claims. The primary issue in that case was whether certain unfinished knives were unfinished parts of Globe slicing machines. After finding that they were such parts,

it became necessary to determine whether they were parts of "Machines having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device" and dutiable at 27½ per centum ad valorem in paragraph 353 of the Tariff Act of 1930, as modified by the trade agreement between the United States and the United Kingdom, *supra*.

With respect to the language just quoted, we found and held upon the record in that case that the negotiators of the trade agreement contemplated machines such as the Globe slicing machines which have as an essential feature an electrical element or device but which, nevertheless, are of a kind which could be designed to operate without such electrical element or device.

In discussing that phase of the case further in *Engelsted, supra,* we reasoned as follows:

* * * The meaning of that portion of the provision here under consideration, reading "if of a kind which could be designed to operate without such electrical element or device," would therefore appear to be self-explanatory.

Hence, two questions arise when it is sought to apply the provisions of paragraph 353, as modified, *supra*, to an importation. First, is the imported machine essentially electrical, the electrical feature being so essential that without it the machine will not function normally, for the purposes intended? Second, if it is such an electrical machine, could a machine be invented or "designed" to perform the same function without the essential electrical feature and would such machine be one which is not elsewhere specifically provided for and therefore within the purview of paragraph 372?

* * * * * * *

It is our opinion, therefore, that the language of paragraph 353, as modified by the trade agreement, *supra*, reading, "Machines * * * if of a kind which could be designed to operate without such electrical element or device" would make the test of classification thereunder the modes of operation to achieve a particular result in each case. Of course, if the Globe slicing machine, to which reference has been made herein, could by minor alteration be made to operate by other than electrical power, it would not be within the purview of paragraph 353, as interpreted in the *Dryden* and *Coxhead* cases, *supra* [*United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, and *Ralph C. Coxhead Corp.* v. *United States*, id. 96, T. D. 47080], and necessarily not covered by the provisions of paragraph 353, as modified.

Applying the rules above set forth to the unfinished knives for Globe slicing machines here before us, the function of the machines is the slicing of meat and vegetables, and the sole motivating power is an electric motor incorporated therein. Such machines are, therefore, essentially electrical. To the inquiry, could a machine be invented or "designed" to perform the same function without an electric motor, we believe the evidence herein requires an affirmative answer.

There is nothing in the record before us, viewed in the light of the *Engelsted* decision, which would indicate error in the action of the collector. Implicit in his decision are the findings (1) that the burners in controversy are machines which have "as an essential feature an electrical element or device" and (2) that the machines are "of a kind which could be designed to operate without such electrical element or device." The evidence in the record before us is not sufficient to overcome the presumed correctness which attaches to his official act.

While there is a conflict of evidence upon the point whether the subject machines are of a kind which could be designed to operate without an essential electrical element, there is, nevertheless, undisputed proof that such machines have been actually used to a substantial extent and operated "without such electrical element or device" within the meaning of said paragraph 353, as modified.

Accordingly, we find and hold upon the record herein that the oil burners and parts in controversy were properly classified by the collector. The protest is, therefore, overruled in all respects.

Judgment will be entered in harmony with the views above expressed.